# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| PAUL C. GLAESER, Derivatively on Behalf Of 3M COMPANY,<br><br>        Plaintiff,<br><br>    v.<br><br>INGE G. THULIN, MICHAEL F. ROMAN, NICHOLAS C. GANGESTAD, SONDRA L BARBOUR, THOMAS K. BROWN, VANCE D. COFFMAN, PAMELA J. CRAIG, DAVID B. DILLON, MICHAEL L. ESKEW, HERBERT L. HENKEL, AMY E. HOOD, MUHTAR KENT, EDWARD M. LIDDY, DAMBISA F. MOYO, GREGORY R. PAGE, ROBERT J. ULRICH and PATRICIA WOERTZ,<br><br>        Defendants,<br><br>    -and-<br><br>3M COMPANY,<br>        Nominal Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )<br><br>C.A. No. _____ |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Paul C. Glaeser ("Plaintiff") , by his undersigned attorneys, derivatively and on behalf of Nominal Defendant 3M Company ("3M" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Inge G. Thulin, Michael F. Roman, Nicholas C. Gangestad, Sondra L Barbour, Thomas K. Brown, Vance D. Coffman,  Pamela J. Craig,  David B. Dillon, Michael L. Eskew,  Herbert L. Henkel, Amy E. Hood, Muhtar Kent, Edward M. Liddy, Dambisa F. Moyo, Gregory R. Page, Robert J. Ulrich and Patricia Woertz (collectively, the

"Individual Defendants") for breaches of their fiduciary duties as directors and/or officers of 3M, unjust enrichment, waste of corporate assets, and violations of Sections 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for his Verified Derivative Complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding 3M, news reports, securities analysts' reports and advisories about the Company, and other information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.     NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by 3M's directors and officers.

2.     3M is a diversified technology company with a global presence in the Industrial, Safety and Graphics, Health Care, Electronics and Energy and Consumer businesses. 3M is among the leading manufacturers of products for many of the markets it serves. Most 3M products involve expertise in product development, manufacturing and marketing, and are subject to competition from products manufactured and sold by other technologically oriented companies. At December 31, 2018, the Company employed 93,516 people (full-time equivalents), with 37,412 employed in the United States and 56,104 employed internationally.

3.      3M manages its operations in five business segments. The reportable segments are Industrial, Safety and Graphics, Health Care, Electronics and Energy, and Consumer. 3M's five business segments bring together common or related 3M technologies, enhancing the development of innovative products and services and providing for efficient sharing of business resources.

4.      Defendants made a series of materially false and misleading statements and omitted to disclose material facts regarding to the Company's exposure to legal liability associated with its most lucrative product offerings: manmade chemicals known as per and polyfluoroalkyl substances ("PFAS") which created significant environmental damage. As a result, securities class actions entitled *Heavy & General Laborers' Locals 472 & 172 Welfare Fund,* 19-15982 (D.N.J.) and *Rousseau v. 3M Company*, *et al.*, 19-cv-17090 (D.N.J.) (*"*10(b) Actions") were filed.  The Company has also had to pay out $850 million to settle claims brought by the Minnesota Attorney General and now faces additional lawsuits brought by other state's regulators seeking hundreds of millions in damages due to the environmental damages caused by its products.

5.      As a result of the conduct alleged in the 10(b) Actions and the likely liability, attorney's fees, expenses, loss of reputation and potential loss of business that will be incurred, 3M and its shareholders have been and are continuing to be damaged. The Individual Defendants breached their fiduciary duties to 3M by exposing 3M to legal liability as a result of the marketing of harmful chemicals in its products and engaging in the issuance of materially false and misleading statements in violation of the Securities Laws.

6.      The Individual Defendants further breached their fiduciary duties by causing the Company to fail to maintain internal controls which, if implemented, would have provided some backup system to help assure that the statements made in the name of the company were not

materially false and misleading and did not omit to disclose material facts about 3M's environmental risks.

7.      As a result of the foregoing, the Individual Defendants' and Company's public statements, identified below, were materially false and misleading at all relevant times. The Individual Defendants failed to correct and caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

## II.      JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and raises a federal question pertaining to the claims made under Section 14(a) of the Exchange Act.

9.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

10.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

11.     Venue is proper in this District because the Company transacts substantial business in this District through the sale and/or distribution of its products.

## III.      PARTIES

12.     Plaintiff is a current shareholder of 3M common stock. Plaintiff has held 3M common stock during the period when the Defendants were engaging in the conduct complained of below.

13.     Defendant Inge G. Thulin ("Thulin") previously served as 3M's Executive Chairman (July 2018-June 2019) and Chairman, President, and CEO (2012-July 2018). Thulin was also previously Executive Vice President and Chief Operating Officer of 3M (2011-2012), with responsibility for all of 3M's business segments and international operations, an Executive Vice President of International Operations (2004-2011), and originally joined 3M Sweden in 1979, working in sales and marketing. As CEO, Thulin spoke on 3M's behalf in releases, conference calls, and SEC filings. Pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002, SEC Rule 13a-14(a), and 18 U.S.C. §1350, Thulin certified the Company's Form 10-Ks filed with the SEC on February 9, 2017 and February 8, 2018. Thulin also signed the Company's Form 10-Ks dated February 9, 2017, February 8, 2018, and February 7, 2019.

14.     Defendant Michael F. Roman ("Roman") was appointed Chief Executive Officer, effective July 1, 2018. Prior to that, Roman served as the Company's Executive Vice President and Chief Operating Officer from 2017 to 2018, Executive Vice President, Industrial Business Group, from 2014 to 2017, and Senior Vice President, Business Development, from 2013 to 2014. Roman became Chairman of the Board effective May 14, 2019, following his election for a one-year term as a director by stockholders at the 2019 Annual Stockholder Meeting.  As CEO, defendant Roman spoke on 3M's behalf in releases, conference calls, and SEC filings. Pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002, SEC Rule 13a-14(a), and 18 U.S.C. §1350, defendant Roman certified the Company's Form 10-K filed with the SEC on February 7, 2019. Defendant Roman also signed the Company's Form 10-K dated February 7, 2019.

15.     Defendant Nicholas C. Gangestad ("Gangestad") has served as 3M's Senior Vice President and Chief Financial Officer since 2014.  As CFO, Gangestad spoke on 3M's behalf in releases, conference calls, and SEC filings. Pursuant to §§302 and 906 of the Sarbanes-Oxley Act

of 2002, SEC Rule 13a-14(a), and 18 U.S.C. §1350, Gangestad certified the Company's 2016, 2017 and 2018 Form 10-Ks filed with the SEC on February 9, 2017, February 8, 2018, and February 7, 2019 respectively.

16.     Defendant Sondra L Barbour ("Barbour") has been a member of the 3M Board since 2014.  She serves on the Audit and Governance Committees.  Barbour signed the Company's 2016, 2017 and 2018 Form 10-Ks filed with the SEC on February 9, 2017, February 8, 2018, and February 7, 2019 respectively.

17.     Defendant Thomas K. Brown ("Brown") has been a member of the 3M Board since 2013.  He serves on the Audit and Nominating and Governance Committees.  Brown signed the Company's 2016, 2017 and 2018 Form 10-Ks filed with the SEC on February 9, 2017, February 8, 2018, and February 7, 2019 respectively.

18.     Defendant Vance D. Coffman ("Coffman") was a member of the 3M Board until May 8, 2018.

19.      Defendant Pamela J. Craig ("Craig") has been a member of the 3M Board since 2019 and serves on the Audit and Finance Committees.

20.     Defendant David B. Dillon ("Dillon") has been a member of the 3M Board since 2015.  He serves as Chair on the Audit Committee, and as a member of the Nominating and Governance Committee. Dillon signed the Company's 2016, 2017 and 2018 Form 10-Ks filed with the SEC on February 9, 2017, February 8, 2018, and February 7, 2019 respectively.

21.     Defendant Michael L. Eskew ("Eskew") has been a member of the 3M Board since 2003.  He serves on the Compensation Committee and as Chair of the Nominating and Governance Committee.  Eskew signed the Company's 2016, 2017, and 2018 Form 10-Ks filed with the SEC on February 9, 2017, February 8, 2018, and February 7, 2019 respectively.

22.     Defendant Herbert L. Henkel ("Henkel") has been a member of the 3M Board since 2007.  He serves as Chair of the Compensation Committee and as a member of the Nominating and Governance Committee.  Henkel signed the Company's 2016, 2017, and 2018 Form 10-Ks filed with the SEC on February 9, 2017, February 8, 2018, and February 7, 2019 respectively.

23.     Defendant Amy E. Hood ("Hood") has been a member of the 3M Board since 2017.  She serves on the Compensation and Finance Committees.  Hood signed the Company's 2017 and 2018 Form 10-Ks filed with the SEC on February 8, 2018, and February 7, 2019 respectively.

24.     Defendant Muhtar Kent ("Kent") has been a member of the 3M Board since 2013.  He serves as a member of the Compensation Committee and Chair of the Finance Committee.  Kent signed the Company's 2016, 2017, and 2018 Form 10-Ks filed with the SEC on February 9, 2017, February 8, 2018, and February 7, 2019 respectively.

25.      Defendant Edward M. Liddy ("Liddy") has been a member of the 3M Board since 2000.  He serves on the Compensation and Nominating and Governance Committees.  Liddy signed the Company's 2016, 2017, and 2018 Form 10-Ks filed with the SEC on February 9, 2017, February 8, 2018, and February 7, 2019 respectively.

26.     Defendant Dambisa F. Moyo ("Moyo") has been a member of the 3M Board since 2018.  She serves on the Audit and Finance Committees.  Moyo signed the Company's 2018 Form 10-K filed with the SEC on February 7, 2019.

27.     Defendant Patricia Woertz ("Woertz") has been a member of the 3M Board since 2016. She serves on the Compensation and Finance Committees. Woertz signed the Company's 2016, 2017 and 2018 Form 10-Ks filed with the SEC on February 9, 2017, February 8, 2018, and February 7, 2019 respectively.

28.     Defendant Robert J. Ulrich ("Ulrich") was a member of the 3M Board from 2008 until 2017.  Ulrich signed the Company's signed the Company's 2016 Form 10-K which was filed on February 9, 2017.

29.     Defendant Gregory R. Page ("Page") has been a member of the 3M board since 2016.  He serves on the Audit and Governance Committees.  Page signed the Company's 2016, 2017 and 2018 Form 10-Ks filed with the SEC on February 9, 2017, February 8, 2018, and February 7, 2019 respectively.

30.     Nominal Defendant 3M is a Delaware corporation with its principal executive offices at 3M Center, St. Paul, Minnesota 55144. 3M stock trades on the New York Stock Exchange under the ticker symbol "MMM."

## IV.     PFOS AND PFOA – 3M's RECORD OF CONTAMINATION

31.     Perfluorooctane sulfonic acid ("PFOS") and perfluorooctanoic acid ("PFOA") fall into the broader category of polyfluoroalkyl chemicals ("PFAS"), and there are over 5,000 of them throughout the planet. While companies like 3M moved away from PFOS and PFOA chemicals in the early 2000s, they remain in the environment causing harm. The Centers for Disease Control and Prevention maintains that certain PFAS chemicals, including PFOS and PFOA, are shown by some studies to increase the risk of cancer, cholesterol levels, and interfere with the body's natural hormones.

32.     The two chemicals were first developed for market use by 3M, using them to produce firefighting foam, which was used in large quantities by the military, and for Scotchgard, the Company's stain and water repellent product for fabric. For a time, production of the chemicals was mainly done in Minnesota.

33.     At a recent House Oversight Sub-committee hearing held in September 2019, experts testified, including Minnesota Attorney General Lori Swanson, that 3M had damaged the drinking water and the natural resources in the Twin Cities Metro area for years.  "Unfortunately, 3M knew about the risks of the chemicals to the drinking water, the environment, and human health for decades, but concealed its knowledge, subverted the science, and kept pushing the chemicals out the door," said Swanson.  The State of Minnesota settled with 3M in 2018 for $890 million, with $850 million sectioned off for state groundwater projects. The figure represented one of the largest environmental settlements in American history.

34.     "The executives testifying today hid studies showing how PFAS poisons drinking water and presents grave health risks for millions of Americans," Sonya Lunder, senior toxics policy advisor at the Sierra Club, said in a statement. "It's time to make these polluters pay. Congress must urgently regulate the production, use and disposal of PFAS chemicals."

35.     On the same day of the hearing, the National Wildlife Federation released a report detailing the impact of PFAS on the Great Lakes Region. Even with oversight, the National Wildlife Federation, the largest nonprofit conservation education and advocacy organization in the country, is concerned with the pace of cleanup and impact studies around PFAS, calling the current situation a crisis.

## V.     MATERIALLY FALSE AND MISLEADING STATEMENTS

36.     3M has repeatedly falsely stated that PFAS are not a danger to public health.  For instance, 3M company spokeswoman Fanna Haile-Selassie told *Bloomberg* in November 2018 that "[w]hile the science behind PFAS is complex, the vast body of scientific evidence, which consists of decades of research conducted by independent third parties and 3M does not show that PFOS or PFOA causes harm in people at current or historical levels,"

37.     The Company repeatedly issued similar, false statement in its SEC filing. Specifically, in its Form 10-Ks for the year ending December 31, 2016 ("2016 Form 10-K"); for

the year ending December 31, 2017 ("2017 Form 10-K"); and for the year ending December 31, 2018 ("2018 Form 10-K"), 3M made materially misleading statements to investors regarding certain risk factors associated with investing in 3M, in particular with respect to 3M's environmental law compliance, and environmental matters and litigation.

### A.      Materially False and Misleading Risk Factor Warning

38.      Despite its actual knowledge of internal studies and documents evidencing the toxicity of PFAS dating back to the 1970s, as well as its awareness (or reckless disregard) of the potentially massive nationwide (and even global) legal liability for releasing PFAS into the environment since the 1960s, 3M's annual reports on Form 10K contained only one statement related in any way to its potential legal exposure in its Form 10-Ks. The 2018 Form 10-K statement was as follows:

> The Company's future results may be affected by various legal and regulatory proceedings and legal compliance risks, including those involving product liability, antitrust, intellectual property, environmental, the U.S. Foreign Corrupt Practices Act and other anti- bribery, anti-corruption, or other matters. The outcome of these legal proceedings may differ from the Company's expectations because the outcomes of litigation, including regulatory matters, are often difficult to reliably predict. Various factors or developments can lead the Company to change current estimates of liabilities and related insurance receivables where applicable, or make such estimates for matters previously not susceptible of reasonable estimates, such as a significant judicial ruling or judgment, a significant settlement, significant regulatory developments or changes in applicable law. A future adverse ruling, settlement or unfavorable development could result in future charges that could have a material adverse effect on the Company's results of operations or cash flows in any particular period. For a more detailed discussion of the legal proceedings involving the Company and the associated accounting estimates, see the discussion in Note 16 "Commitments and Contingencies" within the Notes to Consolidated Financial Statements.

39.      The sole change to that risk warnings between 2016 and 2018 was to adjust the reference number of the note to the consolidated financial statements addressing legal proceedings

in the last sentence.  Accordingly, the risk warning was a generic "catch-all" provision that was not tailored to 3M's actual known legal exposure.

**B.     Environmental Law Compliance**

40.     3M's statement regarding the Company's Environmental Law Compliance likewise remained identical in the 2016, 2017, and 2018 annual reports on Form10-K, other than clerical edits to the year and amount expended on capital projects related to protecting the environment in the third paragraph. The 2018 Form 10-K's Environmental Law Compliance section stated as follows:

**Environmental Law Compliance**

3M's manufacturing operations are affected by national, state and local environmental laws around the world. 3M has made, and plans to continue making, necessary expenditures for compliance with applicable laws. 3M is also involved in remediation actions relating to environmental matters from past operations at certain sites (refer to "Environmental Matters and Litigation" in Note 16, Commitments and Contingencies).

Environmental expenditures relating to existing conditions caused by past operations that do not contribute to current or future revenues are expensed. Reserves for liabilities for anticipated remediation costs are recorded on an undiscounted basis when they are probable and reasonably estimable, generally no later than the completion of feasibility studies, the Company's commitment to a plan of action, or approval by regulatory agencies. Environmental expenditures for capital projects that contribute to current or future operations generally are capitalized and depreciated over their estimated useful lives.

In 2018, 3M expended approximately $27 million for capital projects related to protecting the environment. This amount excludes expenditures for remediation actions relating to existing matters caused by past operations that do not contribute to current or future revenues, which are expensed. Capital expenditures for environmental purposes have included pollution control devices – such as wastewater treatment plant improvements, scrubbers, containment structures, solvent recovery units and thermal oxidizers – at new and existing facilities constructed or upgraded in the normal course of business. Consistent with the Company's emphasis on environmental responsibility, capital expenditures (other than for remediation projects) for known projects are presently expected to be approximately $75 million over the next two years for new or expanded

programs to build facilities or modify manufacturing processes to minimize waste
and reduce emissions.

While the Company cannot predict with certainty the future costs of such
cleanup activities, capital expenditures or operating costs for environmental
compliance, the Company does not believe they will have a material effect on its
capital expenditures, earnings or competitive position.

41.     This statement was also materially misleading because, while statement regarding

the effect of environmental compliance on 3M's capital expenditures and earnings did not change

from the 2016 Form 10-K through the 2018 Form 10-K, the Individual Defendants possessed

actual knowledge of the increasing scrutiny of and litigation relating to PFAS, including a $671

million DuPont PFAS settlement and its $850 million State of Minnesota settlement relating to

PFAS, including additional litigation.

### C.      Environmental Matters and Litigation

42.     Unlike the statements regarding environmental law compliance in the 2016, 2017

and 2018 Form 10-Ks, which remained substantively identical from year to year, the

Environmental Matters and Litigation sections changed during that same period, as litigation

relating to PFAS dramatically increased. However, what did not substantively change (other than

dates and dollar figures) was the last three paragraphs of this section, subtitled Environmental

Liabilities and Insurance Receivables, which remained the same from the 2016 Form 10-K to the

2018 Form 10-K (other than edits to dates/dollar figures). The 2018 Form 10-K stated the

following:

#### Environmental Liabilities and Insurance Receivables

As of December 31, 2018, the Company had recorded liabilities of $25
million for estimated "environmental remediation" costs based upon an evaluation
of currently available facts with respect to each individual site and also recorded
related insurance receivables of $8 million. The Company records liabilities for
remediation costs on an undiscounted basis when they are probable and reasonably
estimable, generally no later than the completion of feasibility studies or the

Company's commitment to a plan of action. Liabilities for estimated costs of environmental remediation, depending on the site, are based primarily upon internal or third-party environmental studies, and estimates as to the number, participation level and financial viability of any other potentially responsible parties, the extent of the contamination and the nature of required remedial actions. The Company adjusts recorded liabilities as further information develops or circumstances change. The Company expects that it will pay the amounts recorded over the periods of remediation for the applicable sites, currently ranging up to 20 years.

As of December 31, 2018, the Company had recorded liabilities of $59 million for "other environmental liabilities" based upon an evaluation of currently available facts to implement the Settlement Agreement and Consent Order with the MPCA (including the best estimate of the probable liability under the settlement of the NRD Lawsuit for interim treatment of municipal and private wells), the remedial action agreement with ADEM, as well as presence in the soil and groundwater at the Company's manufacturing facilities in Decatur, Alabama, and Cottage Grove, Minnesota, and at two former disposal sites in Washington County, Minnesota (Oakdale and Woodbury). The Company expects that most of the spending will occur over the next four years.

It is difficult to estimate the cost of environmental compliance and remediation given the uncertainties regarding the interpretation and enforcement of applicable environmental laws and regulations, the extent of environmental contamination and the existence of alternative cleanup methods. Developments may occur that could affect the Company's current assessment, including, but not limited to: (i) changes in the information available regarding the environmental impact of the Company's operations and products; (ii) changes in environmental regulations, changes in permissible levels of specific compounds in drinking water sources, or changes in enforcement theories and policies, including efforts to recover natural resource damages; (iii) new and evolving analytical and remediation techniques; success in allocating liability to other potentially responsible parties; and (v) the financial viability of other potentially responsible parties and third-party indemnitors. For sites included in both "environmental remediation liabilities" and "other environmental liabilities," at which remediation activity is largely complete and remaining activity relates primarily to operation and maintenance of the remedy, including required post-remediation monitoring, the Company believes the exposure to loss in excess of the amount accrued would not be material to the Company's consolidated results of operations or financial condition. However, for locations at which remediation activity is largely ongoing, the Company cannot estimate a possible loss or range of loss in excess of the associated established accruals for the reasons described above.

**D.      The Market Begins to Learn of the Falsity of Defendants' PFAS Statements, But Defendants Continue to Conceal the Truth**

43.     After the State of Minnesota settled its lawsuit with 3M, the Minnesota Attorney General Swanson posted a trove of internal 3M emails and memos on a state website, which had never been published before. As *The Intercept* reported on July 31, 2018, in an article by Sharon Lerner entitled "3M Knew About the Dangers of PFOA and PFOS Decades Ago, Internal Documents Show," which included 3M's false denials:

> A lawsuit filed by Minnesota against 3M, the company that first developed and sold PFOS and PFOA, the two best-known PFAS compounds, has revealed that the company knew that these chemicals were accumulating in people's blood for more than 40 years. 3M researchers documented the chemicals in fish, just as the Michigan scientist did, but they did so back in the 1970s. That same decade, 3M scientists realized that the compounds they produced were toxic. The company even had evidence back then of the compounds' effects on the immune system, studies of which are just now driving the lower levels put forward by the ATSDR, as well as several states and the European Union.

> The suit, which the Minnesota attorney general filed in 2010, charges that 3M polluted groundwater with PFAS compounds and "knew or should have known" that these chemicals harm human health and the environment, and "result in injury, destruction, and loss of natural resources of the State." The complaint argues that 3M "acted with a deliberate disregard for the high risk of injury to the citizens and wildlife of Minnesota." 3M settled the suit for $850 million in February, and the Minnesota Attorney General's Office released a large set of documents – including internal studies, memos, emails, and research reports – detailing what 3M knew about the chemicals' harms.

> Some of the documents had been under seal since 2005 as a result of a separate lawsuit over PFAS contamination in Minnesota. And the documents had been in the EPA's possession for at least 18 years: In 2000, 3M gave the EPA hundreds of documents it had withheld from the agency, resulting in more than $1.5 million in penalties in 2006 for 244 violations of the Toxic Substances Control Act. Even so, for years the EPA did nothing. Even as a few government officials and company scientists understood the vast dangers they posed, PFAS were allowed to spread into groundwater and then drinking water, into people and their children, into animals, plants and the food system where they remain today.

*     *     *

> As a staff epidemiologist at 3M, Geary Olsen has had a wealth of data at his fingertips. The company he's worked for since at least 1998 makes more than 55,000 products and has more than 90,000 employees. Olsen had access to internal

information about both and has been able to combine them to pursue the kinds of scientific questions most researchers can only dream of being able to ask and answer.

In one study, for instance, Olsen looked at blood tests of 3M employees at the company's plants in Antwerp, Belgium, and Decatur, Alabama, both of which made PFOA and PFOS, among other products. By the late 1990s when Olsen was embarking on this research, these chemicals were known within the company to accumulate in humans and alter cholesterol levels in lab animals. Because the workers had undergone three separate rounds of blood tests, Olsen was able to trace the levels of the chemicals in workers' blood over time. And by combining his results with various clinical measures the company had been tracking in its workers, he was able to see whether there was a relationship between the chemical and these health outcomes.

Olsen's findings, written up in a draft report in October 2001, were clear. There was a positive association between the amount of PFOA in workers' blood and their levels of cholesterol and triglycerides, states the report, on which Olsen is listed as the principal investigator. The report devoted more than 20 tables to triglycerides and cholesterol, detailing a relationship that later studies would confirm: PFOA increased people's levels of triglycerides, which are a type of fat, and cholesterol, both of which can increase the chance of heart disease. The results were in keeping with rat evidence, as the report noted.

Yet less than two years later, when Olsen and the three co- authors on the report – all 3M employees – published an article based on the same research, it downplayed this key finding. Indeed, according to the study, which ran in the March 2003 issue of the Journal of Occupational and Environmental Medicine, "There were no substantial changes in hematological, lipid, hepatic, thyroid, or urinary parameters consistent with the known toxicological effects of PFOS or PFOA" – a statement that appears to contradict the authors' earlier finding.

In the 19th paragraph of the 2003 article, the authors note that PFOA was "positively associated with cholesterol and triglycerides" and that "serum PFOS was positively associated with the natural log of serum cholesterol . . . and triglycerides," but dismiss these effects as "minimal." The article omits most of the information that was contained in the draft's tables and clearly laid out the increase in cholesterol and triglycerides in exposed workers.

The minimizing of this bad news is just one of several instances in which 3M seems to have downplayed, spun, and tailored its own research to make these two PFAS chemicals and others it produced appear safer than they were, according to the documents made public by Minnesota's attorney general.

In some cases, relatively reassuring findings about the chemicals made their way into the scientific literature, while other more concerning ones – like the 1993 observation that goats passed PFOS to their offspring through their milk, or the 1998 discovery that PFOS had made its way into eagles found in the wild, or the

association between PFOA and lipids that Geary identified – did so only after many years. In several cases, 3M appears to have not pursued further research based on discoveries that suggested the chemicals posed harm. And the company also relied on several paid scientists, including John Giesy, now a professor at the University of Saskatchewan, who weighed in on the environmental impact of PFOA and PFOS without disclosing their funding from 3M.

In an email, a 3M spokesperson strenuously denied that the company tailored its research around PFAS, writing that "neither 3M nor Dr. Olsen has distorted or suppressed the scientific evidence regarding PFAS in any way." The email also pointed out that the company eventually gave the EPA Olsen's 2001 report, which at this point has "been publicly available for well over a decade." While acknowledging that Olsen found an association between cholesterol levels and PFOA, the 3M spokesperson noted that the effect of PFOA he documented in some workers – increasing cholesterol levels – was inconsistent with those observed in rats, whose levels decreased after exposure to the chemical, and that "the science is complex and neither the study nor the larger body of scientific evidence on this issue establishes causation."

In a separate email, the 3M spokesperson wrote that "the Minnesota Attorney General released a small set of documents that should not be taken out of context in an effort to distort the full record regarding 3M's actions with respect to PFOA or PFOS. 3M acted reasonably and responsibly in connection with products containing PFAS, and stands behind its environmental stewardship record."

44.     Thereafter, on November 2, 2018, *Bloomberg* reporters Tiffany Kary and Christopher Cannon published a lengthy exposé, entitled "*Cancer-linked Chemicals Manufactured by 3M are Turning Up in Drinking Water,*" which also contained 3M's false denials and noted in relevant part:

The [Minnesota] attorney general [Lori Swanson] wasn't finished. She also said there had been a scientific cover-up that 3M knew its chemicals were dangerous, yet kept that information from regulators and local residents. Just as the suit settled, she posted a trove of 3M's internal emails and memos on a state website to back up her allegations. 3M's Haile-Selassie called the internal memos a small set of documents that "portrays an incomplete and misleading story and distorts the full record" of 3M's work. It also distorts "who we are as a company," she said.
The records, which include old typed field memos and presentations to 3M's board of directors, would appear to support Swanson's cover-up claim. As the company insisted for more than half a century that the chemicals were safe, the internal documents suggest that its own employees withheld evidence to the contrary. Meanwhile, they were woven into new innovations and spread everywhere, lodging in people and wildlife from the North Pole to the Faroe Islands. As Swanson was

prepared to argue if the case had gone to trial, this gave Cottage Grove a regrettable distinction: "ground zero for a world problem."

\*       \*       \*

In 1997, a telling change appeared in the routine data sheets 3M sent to DuPont, which had been buying its PFAS for decades to manufacture Teflon. They said: "CANCER: WARNING: contains a chemical which can cause cancer." The warning cited joint studies by 3M and DuPont in 1983 and 1993, but gave no further details. Then, without explanation, the warnings soon disappeared, according to Minnesota's court filings.

\*       \*       \*

Scientists outside of 3M have become increasingly outspoken about the risks of PFAS. Linda Birnbaum, director of the toxicology program in the National Institutes of Health, said there's evidence the chemicals are toxic. Most of the thousands of PFAS variants haven't been tested, she said, but all that have been show problems. Phil Brown, a Northeastern University sociology professor who specializes in toxic exposures, likens 3M's actions to cigarette makers who for decades avoided liability from their products' links to cancer.

\*       \*       \*

[College Grove Mayor Myron] Bailey said 3M has been more generous than usual since the settlement. But he wants something more than the company's money. "To this day they have said they don't believe anything is wrong," he said. "If you are a business or individual who has done something wrong, I believe you can be accountable, and say you did it."

E.       **EPA Proposed Action on PFAS**

45.       On February 14, 2019, the Environmental Protection Agency ("EPA") unveiled its

PFAS Action Plan. The same day, 3M issued a public statement on the EPA's PFAS Action Plan,

stating: "3M supports EPA's creation of a PFAS Action Plan and looks forward to reviewing the

plan in detail. 3M agrees with EPA moving forward with the Safe Drinking Water Act's maximum

contaminant level process with respect to PFOA and PFOS. We support regulation rooted in the

best-available science and believe that this plan may help prevent a patchwork of state standards

that could increase confusion and uncertainty for communities."

17

### VI.   **Defendants Finally Disclose the Truth**

46.     On April 25, 2019, 3M announced its first quarter 2019 financial results, acknowledging that the first quarter of 2019 "'was a disappointing start to the year for 3M'" and disclosing that on top of the "$1.16 per share impact" already recorded in the first quarter of 2018 related to the settlement with the State of Minnesota, 3M had "recorded significant litigation-related pre-tax charges of $548 million, or $0.72 per share" in the first quarter 2019 for additional PFAS liability. 3M also announced that it was cutting 2,000 jobs, approximately 2% of its 93,500 employees, and trimming fiscal year 2019 capital expenditures, including on manufacturing, in addition to accelerating other cost control reductions it said were already underway. On this news, the price of 3M common stock declined nearly 13%.

47.     On May 14, 2019, the State of New Jersey filed suit against 3M and other PFAS manufacturers alleging environmental and consumer fraud claims in connection with making and selling firefighting foam products for decades in New Jersey that contained toxic chemicals. Noting that nearly one in five New Jersey residents had received tap water that contained at least trace amounts of one of these chemicals, some of which have been linked to cancer, the lawsuit alleged that the companies knew that their firefighting foam posed a significant health threat.

48.     On May 29, 2019, New Hampshire filed two lawsuits against 3M and others for PFAS contamination. New Hampshire Attorney General Gordon MacDonald said the goal was to recoup damages for the PFAS contamination that had been found in all ten New Hampshire counties, noting that, in towns like Merrimack and Portsmouth, the contamination had put hundreds of families on bottled water. "'It is my hope that those responsible for the manufacture and distribution of PFAS will recognize the severity of the issues they've caused and will become part of the solution,'" MacDonald was quoted saying. On this news, the price of 3M common stock

declined from its close of $163.35 per share on May 28, 2019 to trade as low as $160.50 per share in intraday trading and close at $161.40 per share on May 29, 2019.

49.    On June 6, 2019, Barclays issued a report, entitled "PFAS/PFOS/PFOA Liabilities for Chemours, 3M, and JCI," stating in relevant part:

> PFAS/PFOS/PFOA liability for Chemours, 3M, and JCI has been top-of-mind for many of our Industrial/Materials investors in recent weeks for three main reasons: a) an investor presentation on the risks to MMM/CC at the Sohn conference in early May. After the Sohn conference on May 6th, CC and MMM were down the two days after that presentation 8% and 2% respectively vs. the XLI down 2%. b) 3M updated its reserve for remediating plant sites with PFAS contamination with 1Q earnings. c) The state of NJ AG came out with a headline grabbing suit against CC/3M/JCI plus others on March 25th.

50.    The statements quoted from 3Ms 2016, 2017 and 2018 Form 10-Ks, which were signed by the Individual Defendants, as indicated above, were the result of a breach of fiduciary duty, were materially misleading, thereby inflating the price of 3M common stock, and led to 3M facing liability, attorney's fees and other expenses in connection with related securities class actions.  The Individual Defendants also breached their fiduciary duties by allowing the underlying risky practices to go on which led to not just damage to the environment but 3M paying hundreds of millions of dollars to address legal liability related to the damage it caused to the environment.

51.    The economic loss plaintiff and nominal defendant suffered was a direct result of defendants' fraudulent scheme to artificially inflate the price of 3M's stock and maintain the price at artificially inflated levels, as was revealed by the subsequent and significant decline in the value of 3M's stock when defendants' earlier misrepresentations and omissions became publicly available.

## VII.    THE MATERIALLY FALSE AND MISLEADING PROXY STATEMENTS

### A.    The 2017 Proxy Statement

52.     On or about March 22, 2017, the Company filed with the SEC its Proxy Statement on Form 14a (the "2017 Proxy Statement"). The proxy statement identified the persons who were being nominated for directors in connection with the Company's Annual Meeting of Shareholders which was held on May 9, 2017.

53.     The 2017 Proxy Statement also referenced, among other things, 3Ms "Code of Business Conduct and Ethics for directors," "Public "Policy Engagement", and "Commitment to the Environment and Sustainability."

54.     The 2017 Proxy Statement also states that, "the Corporate Governance Guidelines, the Certificate of Incorporation and Bylaws, the charters of the Board committees, the Director Independence Guidelines, and the Codes of Conduct provide the framework for the governance of the Company and are available on our Web site at www.3M.com, under Investor Relations — Governance." The Investor Relations section provides a section entitled, "3M COMPANY CODE OF BUSINESS CONDUCT AND ETHICS FOR MEMBERS OF THE BOARD OF DIRECTORS."  It states, under the heading:

> "Compliance with Laws, Rules and Regulations; Fair Dealing"

> Directors shall comply, and oversee compliance by employees, officers and other directors, with laws, rules and regulations applicable to the Company, including insider-trading laws.

55.     The 2017 Proxy Statement section "Commitment to the Environment and Sustainability" states in relevant part.

> At 3M, we are working hard to help create a better world for people everywhere. We apply our ingenuity, our expertise, and our technology to solve problems innovatively, and with a focus on solutions for the longer term. Sustainability is fundamental to our business philosophy — from product development and manufacturing to how customers use our products.

> For more than 40 years, 3M has been a leader among global corporations in sustainability actions and measures, beginning with the creation of its

groundbreaking Pollution Prevention Pays (3P) Program in 1975 to a broad portfolio of sustainable products today. As a global corporation, we believe that we have a significant responsibility to society in general, and especially to the communities in which we live and work. Fulfilling our responsibility is important both from an environmental stewardship perspective and as a key competitive strategy. Our corporate vision states: "3M technology advancing every company... 3M products enhancing every home... and 3M innovation improving every life." It is that vision — that focuses on our customers' needs and well-being — that guides our sustainability strategies and goals, and the respect we demonstrate for our social and physical environments.

We have created hundreds of sustainable solutions and product platforms to help our customers manage their environmental footprint —from paint systems that reduce the need for cleaning solvents and window films that ease energy consumption to a greener tape that is made with plant-based adhesive and film.

In January 2013, our CEO formed the Sustainability Center of Excellence to focus on developing and commercializing products which help our customers solve their sustainability challenges and on ensuring sustainability within 3M operations and supply chain. The Vice President of Environment, Health, Safety, and Sustainability reports to the Senior Vice President of 3M Supply Chain, who reports to the CEO. The formation of the Sustainability Center of Excellence demonstrates the Company's commitment to integrate innovation and sustainability into our products and operations for the benefit of our customers in our communities. The primary role of the Center is to develop strategy, set significant goals to track progress, and drive sustainable actions throughout 3M. Sustainability will continue to be a vital focus as we work to truly advance every company, enhance every home, and improve every life.

As part of our sustainability efforts, we are a signatory to the United Nations Global Compact on Human Rights — a policy initiative for businesses to demonstrate their commitment to ten principles in the areas of human rights, labor, environment, and anti-corruption. We will report annually on these corporate responsibility efforts in our Sustainability Report. To learn more about our sustainability efforts, please view our Sustainability Report which is available on our Web site at www.3M.com under About 3M — Sustainability.

**B.    The 2018 Proxy Statement**

56.    On or about March 21, 2018, the Company filed with the SEC a Proxy Statement on Form 14a (the "2018 Proxy Statement"). The 2018 Proxy Statement identified the persons who were being nominated for directors in connection with the Company's Annual Meeting of Shareholders which was held on May 8, 2018.

57.     The 2018 Proxy Statement also referenced the "Code of Business Conduct and Ethics for directors," Code of Conduct and Ethics" for directors, "Code of Conduct for All Employees, disclosure of public policy engagement, and the Company's "Commitment to the Environment and Sustainability."

58.     The 2018 Proxy Statement also states that,

> The Board has adopted Corporate Governance Guidelines which provide a framework for the effective governance of the Company. The guidelines address matters such as the respective roles and responsibilities of the Board and management, the Board's leadership structure, the responsibilities of the independent Lead Director, director independence, the Board Membership Criteria, Board committees, and Board and management evaluation. The Board's Nominating and Governance Committee is responsible for overseeing and reviewing the Guidelines at least annually and recommending any proposed changes to the Board for approval. The Corporate Governance Guidelines, the Certificate of Incorporation and Bylaws, the charters of the Board committees, the Director Independence Guidelines, and the Codes of Conduct provide the framework for the governance of the Company and are available on our website at www.3M.com, under Investor Relations — Governance.

59.     The section entitled "Commitment to the Environment and Sustainability" which states in relevant part:

> At 3M, we are working hard to advance every company, enhance every home, and improve every life. We apply our expertise, and technology to solve problems collaboratively, and with a focus on long term, sustainable solutions that demonstrate our commitment and societal purpose. Sustainability is fundamental to our business — from sustainability-inspired innovation to product stewardship to sustainability in our operations. As we seek to improve every life, we see partnerships to help our customers and communities achieve their sustainability goals as key to that ambition.
>
> For more than 40 years, 3M has been a leader among global corporations in sustainability actions and measures, beginning with the creation of its groundbreaking Pollution Prevention Pays (3P) Program in 1975. As a global corporation, we believe that we have a significant responsibility to society globally, and responsibility to the local communities in which we live and work. Our corporate vision states: "3M technology advancing every company... 3M products enhancing every home... and 3M innovation improving every life." It is that vision — carried out in collaboration with our customers, communities, and partners — that guides our sustainability strategies and goals and aspirations. Our sustainability

efforts improve 3M operations and the operations of our customers. Our product solutions help customers manage their environmental footprint - from paint systems that reduce the need for cleaning solvents to window films that ease energy consumption. Our life cycle management process enables teams to select more sustainable components and encourage more sustainable processes. In addition, our philanthropic and social sustainability programs support the workforce of the future – both in Science, Technology, Education and Math (STEM), as well as the skilled trades. For example, our skills-based volunteering programs for employees encourage sustainability thinking inside the company while supporting the environmental and social needs in our local communities. Our 2025 sustainability goals provide us with a holistic approach to driving sustainability in our own operations, in our communities, and for the needs of our customers.

In January 2013, our CEO elevated the company's focus on sustainability, with emphasis in two areas: (1) developing and commercializing products which help our customers solve their sustainability challenges; and, (2) driving sustainability within 3M operations and supply chain. Sustainability is now embedded across the company with dedicated teams in R&D, Supply Chain, business groups, and regions across the globe. Recently, the establishment of an executive committee, the Science, Technology, and Sustainability Committee, provides leadership, oversight, and strategy to encourage and ensure sustainability opportunities are recognized and strong policies and procedures are in place. In addition, our Corporate EHS and Business Conduct Committee ensures our sustainability principles are embedded throughout the company.

**C.      The 2019 Proxy Statement**

60.      On March 27, 2019, the Company filed with the SEC a Proxy Statement on Form 14a (the "2019 Proxy Statement"). The 2019 Proxy Statement identifies the persons who are being nominated for directors in connection with the Company's Annual Meeting of Shareholders which was held on May 14, 2019.

61.      The 2019 Proxy Statement also references 3M's Codes of Conduct.  According to the 2019 Proxy Statement:

All of our employees, including our Chief Executive Officer, Chief Financial Officer, and Chief Accounting Officer, are required to abide by 3M's Code of Conduct to ensure that our business is conducted in a consistently legal and ethical manner. These policies form the foundation of a comprehensive process that includes compliance with corporate policies and procedures and a Company-wide focus on uncompromising integrity in every aspect of our operations. Our Code of Conduct covers many topics, including antitrust and competition law, conflicts of

interest, financial reporting, protection of confidential information, and compliance with all laws and regulations applicable to the conduct of our business.

62.      The 2019 Proxy Statement also represented that Board has adopted a Code of

Business Conduct and Ethics for Directors of the Company. With respect to the Director's Code,

the 2019 Proxy Statement stated:

> This Code incorporates longstanding principles of conduct the Company and the Board follow to ensure the Company's business and the activities of the Board are conducted with integrity and adherence to the highest ethical standards, and in compliance with the law. The Company's Code of Conduct for employees and the Code of Business Conduct and Ethics for Directors are available on our website at www.3M.com under Investor Relations — Governance — Governance Documents.

63.      The section entitled: "Commitment to the Environment and Sustainability" states

in relevant part:

> At 3M, we are working hard to advance every company, enhance every home, and improve every life. We apply our expertise, and technology to solve problems collaboratively, and with a focus on long term, sustainable solutions that demonstrate our commitment and societal purpose. Sustainability is fundamental to our business — from sustainability-inspired innovation to product stewardship to sustainability in our operations. As we seek to improve every life, we see partnerships to help our customers and communities achieve their sustainability goals as key to that ambition.
>
> For more than 40 years, 3M has been a leader among global corporations in sustainability actions and measures, beginning with the creation of its groundbreaking Pollution Prevention Pays (3P) Program in 1975. As a global corporation, we believe that we have a significant responsibility to society globally, and responsibility to the local communities in which we live and work. Our corporate vision states: "3M technology advancing every company... 3M products enhancing every home... and 3M innovation improving every life." It is that vision — carried out in collaboration with our customers, communities, and partners — that guides our sustainability strategies and goals and aspirations. Our sustainability efforts improve 3M operations and the operations of our customers. Our product solutions help customers manage their environmental footprint - from paint systems that reduce the need for cleaning solvents to window films that ease energy consumption. Our life cycle management process enables teams to select more sustainable components and encourage more sustainable processes. In addition, our philanthropic and social sustainability programs support the workforce of the future – both in Science, Technology, Engineering and Math (STEM), as well as the skilled

trades. For example, our skills-based volunteering programs for employees encourage sustainability thinking inside the company while supporting the environmental and social needs in our local communities. Our 2025 sustainability goals provide us with a holistic approach to driving sustainability in our own operations, in our communities, and for the needs of our customers.

In January 2013, our CEO elevated the company's focus on sustainability, with emphasis in two areas: (1) developing and commercializing products which help our customers solve their sustainability challenges; and, (2) driving sustainability within 3M operations and supply chain. Sustainability is now embedded across the company with dedicated teams in R&D, Supply Chain, business groups, and regions across the globe. Our Science, Technology, and Sustainability Executive Committee provides leadership, oversight, and strategy to encourage and ensure sustainability opportunities are recognized and strong policies and procedures are in place. Our Chief Technology Officer and our Chief Sustainability Officer report annually to the Board's Nominating and Governance Committee on our sustainability efforts. In addition, our Corporate EHS and Business Conduct Committee ensures our sustainability principles are embedded throughout the company. In December 2018, 3M announced that starting in 2019 every new product will be required to have a Sustainability Value Commitment that builds on 3M's history of creating products that emphasize reuse, recycling, and reduced resource use for 3M's operations and for our customers. As of March 1, 2019, 3M's global headquarters in St. Paul – which is home to our largest employee base – will be powered by 100% renewable energy. We are also committing to move our entire global operations to 100% renewable energy, with an interim target of 50% by 2025. As part of this initiative 3M will be joining RE100, an influential group of companies committed to 100% renewable energy.

As part of our sustainability efforts, we are a signatory to the United Nations Global Compact on Human Rights — a policy initiative for businesses to demonstrate their commitment to ten principles in the areas of human rights, labor, environment, and anticorruption. We also align our goals and programs to the United Nations Sustainable Development Goals. We report annually on these efforts in our Sustainability Report. To learn more, please visit www.3M.com/Sustainability

## VIII.  <u>DAMAGES TO 3M</u>

64.     As a direct and proximate result of the Individual Defendants' conduct, 3M is losing and expending, and will lose and expend, many millions of dollars.

65.     Expenditures incurred or to be incurred as a result of the conduct described in this complaint include, but are not limited to, legal fees and payments associated with the Minnesota Action, other actions brought against 3M for environmental issues and actions which will likely

be brought in the future, liability in connection with the Securities Class Action filed against the Company and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

66.     3M is also damaged as a result of the loss of reputation and possible loss of business.

67.      Further, the Company was damaged by the materially false and misleading statements made in the 2017, 2018 and 2019 Proxy Statements, as those Proxy Statements induced shareholders to re-elect the nominee Defendants who then continued to harm the Company, giving rise to actionable Section 14(a) claims and breach of fiduciary duty claims.

68.     As a direct and proximate result of the Individual Defendants' conduct, 3M has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

69.     More specifically, 3M has already paid $850 million in damages to the State of Minnesota and is a defendant in ongoing litigation across the States of Alabama, Illinois, New Hampshire, New Jersey, along with the countries of Belgium and Germany, related to its manufacturing and disposal of PFAS-containing waste. As part of the Company's 1Q19 earnings, it established an additional $235 million reserve to cover the other litigation jurisdictions. Finally, although 3M is reportedly in discussions with insurance carriers in regard to its coverage in certain places, management has warned that it would likely be a while before it received any potential payouts, according to a RBC Capital Markets report dated April 25, 2019.

## IX.     DELAWARE STANDARD OF CONDUCT

70.     Delaware law sets a standard of the duty of loyalty duty of directors which requires directors to act in good faith to advance the best interests of the corporation and, similarly, to refrain from conduct that injures the corporation. The Director Defendants did not meet this standard.

71.     Delaware law also sets a standard for duty of care of directors which requires them to make informed business decisions, and in evaluating information provided by management, directors are expected to review the information critically and not accept it blindly.

72.     By reason of their positions as officers, directors, and/or fiduciaries of 3M and because of their ability to control the business and corporate affairs of 3M, the Individual Defendants owed 3M and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage 3M in a fair, just, honest, and equitable manner.

73.     The Individual Defendants were and are required to act in furtherance of the best interests of 3M and its shareholders so as to benefit all shareholders equally.

74.     The Individual Defendants, because of their positions of control and authority as directors and officers of 3M, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

75.     To discharge their duties, the officers and directors of 3M were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

76.      Each Individual Defendant, by virtue of his or her position as a director and/or officer of 3M owed to the Company and to its shareholders the highest fiduciary duties of loyalty,

good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised 3M's Board at all relevant times.

77.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Securities and Exchange Acts and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of materially false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

78.     To discharge their duties, the officers and/or directors of 3M were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.

79.     By virtue of such duties, the officers and directors of 3M were required to, among other things:(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to 3M's Code of Business Conduct and Ethics, and Code of Business Conduct and Ethics for Directors; (b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; (c) remain informed as to how 3M conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices; (d) establish and maintain systematic and accurate records and reports of the business and internal affairs of 3M and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records; and (e) maintain and implement an adequate and functioning system of internal controls with respect to the preparation of documents to be filed with the SEC and compliance with environmental laws.

80.     Each director and officer of the Company owes to 3M and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealings.

81.     Each of the Defendants failed to discharge his or her duties as a director of 3M in good faith, in a manner he or she reasonably believed to be in the best interests of 3M, and with the care an ordinarily prudent person in a like position would exercise under similar circumstances, thereby failing to adhere to the standard of conduct required.

## X.   DERIVATIVE ALLEGATIONS

82.    Plaintiff brings this action derivatively and for the benefit of 3M to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of 3M, waste of corporate assets, unjust enrichment, and violations of Sections 14(a) of the Exchange Act.

83.    3M is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

84.    Plaintiff owned 3M common stock while defendants were engaging in the improper conduct described above. Plaintiff will adequately and fairly represent the interests of 3M in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## XI.   DEMAND FUTILITY ALLEGATIONS

85.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

86.    A pre-suit demand on the Board of 3M is futile and, therefore, excused. At the time of filing of this action, the Board consisted of the following individuals: Brown, Craig, Dillon, Eskew, Henkel, Hood, Kent, Liddy, Moyo, Page, Roman, and Woertz. Plaintiff only needs to allege demand futility as to six of the eleven Directors who are on the Board at the time this action is commenced.

87.    Demand is excused as to all of the Individual Defendants because each one of them face, individually and collectively, a substantial likelihood of liability as a result of the actions they engaged in with issuance of materially false and misleading statements and/or environmental issues. All, except Craig, made and/or caused the Company to make the materially false and

misleading statements and omissions of material fact. Indeed, each, other than Craig, signed at least one of the Form 10-Ks alleged to be materially false and misleading and most of them signed all three 10-Ks that are the subject of the related securities class action.

88.     As a result of the foregoing, the Individual Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

89.     The directors are responsible for the 3M Code of Conduct and Ethics and yet, by making materially false and misleading statements or omitting to disclose material facts, have themselves violated the code which also supports the futility of any demand made on the board. Indeed the Defendants conducted little, if any, oversight of the Company's internal controls to provide assurance that all disclosures were materially accurate and that the Company was not violating any anti-trust laws and did not in fact support the high level of environmental responsibility set forth in the 3M Commitment to Environment and Sustainability as set forth in the 2017, 2018 and 2019 Proxy Statement.

90.     Demand in this case is excused because the Directors named as defendants herein, control the Company and are beholden to each other. The Directors have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

91.     All of the Individual Defendants breached the duty of candor by making, or causing the Company to make, false and misleading statements regarding the Company's business,

operations, and prospects, despite having knowledge of the falsity of those statements. The Individual Defendants may not be indemnified for breaching the duty of candor. As a result, all of the Individual Defendants face a substantial likelihood of liability and cannot evaluate a demand with disinterest. Therefore, demand is futile, and thus, excused.

92.     In violation of the Code of Ethics and the Code of Business Conduct and Ethics for Directors, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Sections 14(a) of the Exchange Act. In further violation of the Code of Business Conduct and Ethics for Directors, as well as the Commitment to the Environment and Sustainability which are referenced or set forth in the Proxy Statements as well as the Individual Defendants failed to comply with laws and regulations, particularly those regarding anti-trust and compete in an honest and ethical manner. Thus, the Individual Defendants face a substantial likelihood of liability and demand is futile as to them.  In addition, because the Individual Defendants did not comply with the Code of Ethics and the Code of Business Conduct and Ethics for Directors and the Commitment to the Environment and Sustainability, the Proxy Statements are materially false and misleading and the Individual Defendants are liable.,

93.     3M has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for 3M any part of the damages 3M suffered, and will continue to suffer, thereby. Thus, any demand on the Directors would be futile.

94.     The acts complained of herein constitute violations of fiduciary duties owed 3M's officers and directors, and these acts are incapable of ratification.

95.     The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of 3M. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of 3M, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

96.     If there is no directors' and officers' liability insurance, then the Directors will not cause 3M to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

97.     Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least six of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against Individual Defendants (except Craig and Gangestad) for Violations of
Section 14(a) of the Securities Exchange Act of 1934**

98.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

99.     The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) Exchange Act claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the non-fraud claims.

100.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

101.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

102.    Under the direction and watch of the Directors then serving, the 2017, 2018 and 2019 Proxy Statements were prepared and filed with the SEC and failed to disclose that: (1) the Company did not comply with Code of Ethics and the Code of Business Conduct and Ethics for

Directors and the Commitment to the Environment and Sustainability referenced or set forth in the 2017, 2018 and 2019 Proxy Statements.

103.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2017, 2018 and 2019 Proxy Statements were materially false and misleading or omitted to disclose material information necessary to make the statements contained therein not materially misleading.

104.    The misrepresentations and omissions were material to shareholders in deciding how to vote on the matters set forth for shareholder determination in the 2017, 2018 and 2019 Proxy Statement, including election of directors and ratification of the appointment of an independent registered public accounting firm.

105.    The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the 2017, 2018 and 2019 Proxy Statements.

106.    Plaintiff on behalf of 3M has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

107.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.  Each Individual Defendant owed to the Company and its shareholders the duty to exercise candor, good faith, and loyalty in the management and administration of 3M's business and affairs.

108.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

109.    The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company and its

shareholders, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of 3M.

110.    In breach of their fiduciary duties, the Individual Defendants either engaged in, or allowed the Company to engage in conduct that was significantly harmful to the environment.

111.    The Individual Defendants also breached their fiduciary duties by causing the Company to fail to maintain internal controls in that there was no system in place to assure that the Company in its periodic SEC filings would make full disclosure of all material facts regarding the its true environmental risks and that the Company was not complying with its Code of Ethics and the Code of Business Conduct and Ethics for Directors and Commitment to the Environment and Sustainability.

112.    In further breach of their fiduciary duties owed to 3M the Individual Defendants intentionally and/or recklessly allowed, made and/or caused the Company to make materially false and misleading statements of material fact and omit material facts in the statements made.

113.    Specifically, Defendants failed to disclose that: (1) the Company allowed the environmental issues set forth above to exist; (2) that the Company was not complying with its Code of Ethics and the Code of Business Conduct and Ethics for Directors and Commitment to the Environment and Sustainability.; and (3) as a result of the foregoing, 3M's public statements set forth above were materially false and misleading at all relevant times.

114.    The Individual Defendants failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

115.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

116.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, 3M has sustained and continues to sustain significant damages in that due to the issuance of materially false and misleading statements by the defendants, it is subject to securities class actions which could result in it paying very significant damages and legal fees and expenses.

117.    Plaintiff, on behalf of 3M, has no adequate remedy at law.

### THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

118.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

119.    By their wrongful acts and materially false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, 3M.

120.    The Individual Defendants either benefitted financially from the improper conduct and their making lucrative unjustly lucrative bonuses or received bonuses, stock options, or similar compensation from 3M that was tied to the performance or artificially inflated valuation of 3M or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

121.    Plaintiff, as a shareholder and a representative of 3M seeks restitution from the Individual Defendants and seeks an order from this Court disgorging any improper profits or compensation (including any performance-based or valuation-based compensation)—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

122.    Plaintiff, on behalf of 3M, has no adequate remedy at law.

## XII.   **PRAYER FOR RELIEF**

WHEREAS, Plaintiff demands judgment in the Company's favor against all of the Individual Defendants, jointly and severally, as follows:

A.      Declaring that Plaintiff may maintain this action on behalf of 3M, and that Plaintiff is an adequate representative of the Company;

B.      Declaring that the Individual Defendants have breached their fiduciary duties to 3M and its shareholders;

C.      Determining and awarding to 3M the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

D.      Directing 3M and the Individual Defendants that are presently directors or officers of 3M to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws, and in particular federal and state environmental laws, the securities laws of the United States and corporate law of the State of Delaware to protect 3M and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2.      a provision to permit the shareholders of 3M to nominate at least five candidates for election to the board;

3.      a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations and in particular environmental, securities laws and the corporate laws of the State of Delaware;

E.      Awarding 3M restitution from Individual Defendants, and each of them;

F.      Awarding Plaintiff, the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

G.      Granting such other and further relief as the Court may deem just and proper.

Dated: October 28, 2019

<strong>LEVI & KORSINSKY, LLP</strong>

By _/s/ Eduard Korsinsky_
Eduard Korsinsky (ek@zlk.com)
Gregory Nespole (gnespole@zlk.com)
55 Broadway, 10th Floor
New York, NY 10006
(212) 363-7500 (phone)
(212) 363-7171 (fax)

*Attorneys for Plaintiff*